Moskowitz, J.
(concurring). I concur with the majority that the trial court improperly precluded plaintiff’s experts’ testimony. I part ways with the majority, however, on the necessity for a hearing in this action. I believe that the court properly held a hearing to determine whether the opinion of plaintiffs expert—that is, the opinion that the collision caused plaintiffs stroke—was based on a proper foundation.
The majority’s conclusion that no Frye hearing was necessary rests on the notion that plaintiff need offer no expert opinion for the “unremarkable” premise that the physical trauma caused by the motor vehicle collision was a competent producing cause of plaintiff’s embolic stroke. I disagree with the *204 majority’s characterization of this premise as “unremarkable”; similarly, I disagree with the majority’s premise that “no factual issue was presented.” Indeed, defendants’ expert, Dr. Alan Se-gal, stated to a reasonable degree of medical certainty that trauma from the accident was not a competent producing cause of plaintiffs embolic stroke and that his reading of the medical literature did not support the opinion that trauma could, in fact, cause an embolic stroke. In this context, there is no basis to simply tacitly accept, as the majority appears to do, that a sudden spike in systolic pressure could cause plaque to rupture and emboli to break off immediately after a stressful event like a car accident. Thus, given the facts of this case, a hearing was necessary to determine whether a proper foundation supported Dr. Oh’s proposed opinion.
Of course, courts may, in their discretion, hold a hearing to determine whether evidence should be placed before the jury; whether the hearings are actually Frye hearings, or whether they are hearings held under another rubric, is of no moment (see e.g. Parker v Mobil Oil Corp., 7 NY3d 434 [2006]). A hearing was particularly appropriate here given the sharp disagreement between the parties’ experts as to what caused plaintiffs stroke, and given Dr. Segal’s assertion that he found no support whatsoever in the medical literature for Dr. Oh’s opinion. If any error existed here, it was not in holding a hearing; rather, the error, if any, was in terming the hearing a Frye hearing rather than simply referring to it as an evidentiary hearing or a Parker hearing.
Tom, J.P. (dissenting). Which came first, the accident or the stroke? The majority, deeming the etiology of an embolus to be established fact within common knowledge (see Carter v Metro N. Assoc., 255 AD2d 251 [1st Dept 1998]; Ecco High Frequency Corp. v Amtorg Trading Corp., 81 NYS2d 610, 617 [Sup Ct, NY County 1948], affd 274 App Div 982 [1st Dept 1948]), makes a daring leap of logic to construe plaintiffs theory that the accident caused the stroke as an “unremarkable premise” and to hold that Supreme Court both abused its discretion in precluding expert testimony in support of that premise and committed error in conducting a Frye hearing on the question of its reliability. In permitting a jury of laypersons to speculate as to the medical cause of plaintiff’s stroke and decide the issue as a question of fact, the majority simply ignores Frye and dispenses with the analysis it requires.
At issue is whether it is generally accepted within the medical community that the trauma associated with a traffic accident— *205 here, a relatively minor collision—can dislodge a portion of a thrombus, causing a stroke when the ensuing embolus or emboli travel to and lodge in arteries supplying the brain, thereby blocking the flow of blood and causing tissue damage. While the mechanism of an embolic stroke is well understood, the majority never addresses the question of whether plaintiffs particular theory of causation is generally accepted, but concludes, anomalously, that the trial court erred in even conducting a Frye hearing (Frye v United States, 293 F 1013 [DC Cir 19233). Their alternative conclusion, that, in any event, the court erred in preventing plaintiff from presenting his theory to the jury, is predicated on a single anecdotal study involving a mere 67, out of 150, largely elderly stroke patients who reported exposure to one of seven potential precipitating factors within the two hours preceding the onset of symptoms.[1] Plaintiff now conjectures that one or more of these factors may have been the cause of his stroke.
Ignoring, for the moment, the failure of plaintiffs original expert witness to identify any of the factors included in the study as the cause of plaintiffs stroke, it is axiomatic that correlation is not tantamount to causation, and a lone study does not a consensus make. The study does not establish that the particular factor identified by any participant actually caused that patient’s stroke or, conversely, that the temporal proximity of the particular factor and the stroke were not merely fortuitous. More than half of the 150 stroke patients interviewed (average age 68) did not identify a precipitating factor. Plaintiff was only 46 years old at the time of the accident.
The majority’s assertion that the conclusion of plaintiff’s expert concerning the causation of plaintiff’s embolic stroke was supported by a “reasonable quantum of legitimate support” is flawed. An isolated and inconclusive study suggesting that, in a minority of the patients interviewed, there was a correlation between a stroke and various possible causative factors is wholly inadequate to fulfill plaintiffs burden to demonstrate that it is generally accepted within the medical community that a stroke can be caused by a vehicular accident, such as the minor collision between the limousine plaintiff was driving and defendant’s bus (see Frye v Montefiore Med. Ctr., 100 AD3d 28, 38 [1st Dept 2012]; Stanski v Ezersky, 228 AD2d 311, 312 [1st Dept 1996], lv denied 89 NY2d 805 [1996]). It is alleged that as *206 the two vehicles were making left turns into the entrance of the Lincoln Tunnel, they came into contact causing the front of the limousine’s bumper to lock with the rear bumper of the bus.
It is a plaintiffs burden to establish general acceptance of a novel theory (Nonnon v City of New York, 32 AD3d 91, 101 [1st Dept 2006], affd 9 NY3d 825 [2007]), and expert testimony will he precluded where the plaintiff fails to demonstrate that the underlying principles upon which the proffered testimony is based have gained general acceptance in the witness’s particular field of expertise (see Lara v New York City Health & Hosps. Corp., 305 AD2d 106 [1st Dept 2003]). Significantly, defendants’ neurologist, Dr. Segal, performed a “literature search” for articles finding a relationship between embolic strokes and automobile accidents or minor trauma and was unable to locate any such article.[2] He further testified that Dr. Oh’s theories— that a spike in blood pressure or stress due to the vehicles’ impact could cause a piece of the thrombus to break off and travel to the brain and cause the stroke—do not exist in “literature or any kind of accepted physiology, scientific physiology that we would ever consider valid.” Dr. Segal testified that there are no known “triggers” for having a piece of the thrombus break off. He was aware of the Finnish study, also referred to by plaintiffs expert, relating a spike in systolic blood pressure to increased risk of a stroke. He stated that the study demonstrated that patients who exhibited a tendency to spike their blood pressure, who were followed for 10 years, were at increased risk for having a stroke compared to patients that did not have that tendency. However, he opined that the study did not conclude that a spike in blood pressure itself directly causes a stroke. Under the circumstances, I agree with the decision of Supreme Court to preclude plaintiff from presenting a novel theory of causation to the jury (see Price v New York City Hous. Auth., 92 NY2d 553, 558 [1998]). Certainly, it should not be faulted for conducting a Frye hearing to inform its determination (cf. Frye v Montefiore Med. Ctr., 100 AD3d at 31 [opportunity to present witnesses at a Frye hearing declined]).
*207 A second issue inexplicably avoided by the majority is that plaintiff advanced two different novel theories of causation on the eve of trial. The theory stated by his original expert was that plaintiffs stroke was brought on by the accident (by inference, and only by inference, as a result of the physical trauma experienced in the collision). The hypothesis appears as a conclusory opinion, expressed in the report of Nabil Yazgi, M.D., dated September 23, 2010, pursuant to CPLR 3101 (d), that “there is [a] probable causal relationship between the Motor Vehicle Accident of 10/2/2006 and the symptoms associated with the Cerebral Vascular Accident on 10/2/2006.” The report makes no mention of the mechanism by which the stroke was induced, whether by trauma or otherwise.
Six months later, confronted with conflicting medical evidence, the doctor issued a supplemental report, resorting to rather tortuous reasoning that utterly fails to salvage his first, unsupported opinion. Dr. Yazgi’s report dated June 28, 2011 concedes that two hospital vascular studies of plaintiff conducted less than two months apart are inconsistent, obliquely attributing the findings based on the earlier study to an anomaly in the radiological medium. Dr. Yazgi states that the hospital report of the first study “describes atheroma in the aortic arch and the presence of a long thrombus.” Regarding the second report, the doctor states, “[T]his thrombus is not present and the aortic arch atheroma is not evident.” He continues, “This is physiologically unlikely[,] which suggests the first report was possibly artifact.[3] Assuming this clot was present on the first report, trauma could feasibly have dislodged it, or a portion of it, causing an embolic stroke.” Summarily stated, “Trauma could cause a CVA of unclear etiology as evidenced by the conflicting reports with regard to the vascular studies.”
The opinion expressed by Dr. Yazgi is that the admittedly “unclear etiology” might conceivably be ascribed to trauma involving an assumed clot in the aortic arch. However, he concedes that this clot is not presently shown to exist and, assuming it ever existed, that its disappearance over a two-month period defies medical explanation. Thus, he attributes the abnormalities seen in the first study (on which his conclusion *208 rests) to “artifact.”
Contrary to the majority’s view, Dr. Yazgi clearly acknowledged that the conclusory opinion expressed in his first report is unsupportable in light of the subsequent radiological study showing no evidence of the medical condition (a long thrombus in the aortic arch) that might have provided a foundation for his previous conclusion. The majority, like plaintiffs subsequently retained medical expert, does not attempt to portray Dr. Yazgi’s second report as sufficient to state a coherent theory regarding the cause of plaintiffs injury. Rather, relying on Mead v Dr. Rajadhyax’ Dental Group (34 AD3d 1139 [3d Dept 2006]), the majority imposes on the defense the burden to secure an exposition of such a theory of causation put forth by an expert on behalf of a plaintiff by seeking “amplification” or “a more complete explication” (contra LaFurge v Cohen, 61 AD3d 426 [1st Dept 2009], lv denied 13 NY3d 701 [2009] [untimely supplemental expert disclosure]; see also Barksdale v New York City Tr. Auth., 294 AD2d 210 [1st Dept 2002] [plaintiff precluded, after defendant’s motion in limine, from offering evidence at trial respecting theory of liability not set forth in notice of claim]). In Mead, it was the plaintiff who sought to preclude the testimony of a defense witness for failure to provide sufficiently specific information regarding a medical expert’s qualifications. It is clear, however, that the Third Department based its decision on the finding that despite the belated disclosure of the defense expert’s qualifications, the plaintiff was adequately informed of the defendants’ theory that the injuries he sustained were the result of recognized complications of anesthesia, as listed on the consent form he had signed (Mead, 34 AD3d at 1141 [“In light of plaintiffs awareness of the defense theory, as well as the information gleaned from the package insert, the listing of this complication on the consent form and the testimony elicited from both experts, we find no prejudice”]).
In the matter at bar, by contrast, no coherent theory relating the stroke sustained by plaintiff to the collision involving defendant’s bus was provided before the hypotheses of plaintiffs present expert witness, Sang Jin Oh, M.D., were articulated in an affidavit dated November 2, 2011. The affidavit begins by defining trauma to include both psychic as well as physical injury. While this is indeed the dictionary definition, it should be noted that nothing in the affidavits previously furnished to the defense mentions psychological trauma as a cause of *209 plaintiffs stroke.[4] Dr. Oh identifies two mechanisms by which the stroke could have been induced: “the sudden body movement associated with the trauma of the accident and the acute stress with the resultant spike in blood pressure associated with the trauma of the accident. Either mechanism was sufficient to detach the embolism.”
Unlike the Mead court, the majority points to nothing in the record sufficient to apprise defendants of the theories of causation ultimately expressed by Dr. Oh on the eve of trial. Thus, the failure to timely disclose these theories was prejudicial to the defense, and it was within the sound exercise of the trial court’s discretion to preclude this testimony (see 1861 Capital Master Fund, LP v Wachovia Capital Mkts., LLC, 95 AD3d 620 [1st Dept 2012]). While it may be, as the majority supposes, that “Dr. Oh was also prepared to testify that the physical trauma to plaintiffs body during the accident was a probable cause of the embolus’s breaking away,” it remains that the supporting affidavit submitted by Dr. Oh confines discussion of the potential cause of plaintiffs stroke to “sudden body movement” and “acute stress with the resultant spike in blood pressure.” It is not error to issue a ruling of preclusion based on the theories actually propounded to the court by the expert.
Given that the first notice of plaintiffs theories of causation was given in Dr. Oh’s affidavit dated November 2, 2011, that jury selection commenced on October 11, and that defendants served their motion to preclude Dr. Oh’s testimony on October 21, the majority’s expression of distress at the timing of the defense motion is difficult to fathom. It is well settled that the burden rests on the proponent of a novel theory advanced on the eve of trial to demonstrate good cause for its admission, especially where a new 3101 (d) response notices a new expert in support of the novel theory (see Lissak v Cerabona, 10 AD3d 308, 309-310 [1st Dept 2004]; Kassis v Teachers Ins. & Annuity Assn., 258 AD2d 271 [1st Dept 1999]). Failure to meet that burden properly results in preclusion.
The effect of the majority’s contrary decision is to eviscerate the Frye rule and permit plaintiff to present to the jury an *210 untested theory that has not gained acceptance in the medical community. The theory proposed by plaintiffs expert invites the jury to speculate that it was the accident that caused his stroke, without making any attempt to rule out the alternative explanation that it was a stroke that may have caused the accident. While plaintiff presents an isolated study that inconclusively supports his expert’s position, the contrary proposition that a stroke impairs function and that a driver’s impaired functionality is likely to cause a vehicular accident is not subject to dispute. Thus, it is equally likely that the onset of plaintiffs stroke impaired his ability to drive, resulting in the collision, and that his symptoms became more acute as the stroke progressed—to feeling faint and dizzy, starting to shake, and, finally, requiring transport to the hospital in an unresponsive state. Of course, had such a theory been advanced by the defense, it would have been equally appropriate to require expert medical testimony concerning the onset and progression of stroke symptoms and the ensuing impairment of the patient’s mental and physical functions. Similarly, the court might have exercised its discretion to inquire whether the progression of stroke symptoms is generally accepted in the medical community. Unlike the majority, I do not presume to decide the question of whether there is a cause and effect relationship between the accident and the stroke as a matter of law. To the contrary, whether a particular event is generally accepted to be a factor in the onset of a medical condition is a matter that eclipses the knowledge and experience of the average jurist and warrants a Frye hearing to decide whether the proffered theory of causation should be presented to the trier of fact. Furthermore, if traffic accidents tend to precipitate embolic strokes, as the majority concludes, why is it, given the millions of accidents occurring annually, that plaintiffs experts have not cited any reports of such a connection in the medical literature?
What the majority ultimately fails to acknowledge is that the facts of this matter establish only a correlation—proximity in time—between the accident and the stroke, not causation sufficient to dispel the possibility that the two events are merely coincidental. Defendants are under no obligation to demonstrate that it was plaintiffs stroke that caused the accident. To recover in this action, plaintiff must establish the contrary proposition that the accident was the immediate cause of his stroke, and before he may place that proposition before the jury, he must provide a foundation for his theory by showing that it has *211 gained general acceptance in the medical community. This he has utterly failed to do. Thus, plaintiff has demonstrated no nonspeculative basis upon which a jury could determine that the vehicular accident of October 2, 2006 was an immediate and proximate cause of his stroke, and the complaint was correctly dismissed. As stated by the Court of Appeals in Bernstein v City of New York (69 NY2d 1020 [1987]), “If there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible” (at 1022 [internal quotation marks omitted]; see also Guzman v 4030 Bronx Blvd. Assoc. L.L.C., 54 AD3d 42 [1st Dept 2008]). Moreover, since plaintiff failed to give defendants notice of either of Dr. Oh’s theories of causation until the eve of trial, his testimony was properly precluded (1861 Capital Master Fund, 95 AD3d at 621).
Accordingly, the order dismissing the complaint should be affirmed.
Mazzarelli and Manzanet-Daniels, JJ. concur with Saxe, J.; Moskowitz, J., concurs in a separate opinion; Tom, J.E, dissents in a separate opinion.
Order, Supreme Court, New York County, entered on or about November 3, 2011, reversed, on the law and the facts and in the exercise of discretion, without costs, and the matter restored to the trial calendar.

. The potential triggers included in the study were emotional stress (both positive and negative), anger, sudden posture change in response to a loud noise or other startling event, intense physical exertion, abrupt temperature change, and heavy eating.

. Remarkably, the majority accords no significance to the absence in the medical literature of any relationship between trauma and embolic strokes. Rather, it improperly shifts the burden to defendants to produce medical studies disproving any such relationship. Nothing in Frye v United States suggests that there is any affirmative burden on the opposing party to establish that a novel theory has been expressly rejected by the members of a particular field of expertise.

. “In radiology, a substance or structure not naturally present in living tissue, but of which an authentic image appears in a radiograph” (Dorland’s Illustrated Medical Dictionary 162-163 [26th ed 1981]).

. As previously noted, Dr. Yazgi’s original affidavit of September 23, 2010, which has been adopted by Dr. Oh, is silent as to the cause of plaintiff’s stroke, including trauma. Dr. Yazgi’s supplemental affidavit of June 28, 2011 which, though incomprehensible, does mention trauma that “could feasibly have dislodged [a clot] or a portion of it, causing an embolic stroke,” has not been adopted by Dr. Oh.